IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

GIA LUCIA M. BODNAR,              )
                                  )
            Plaintiff,            )        8:08CV137
                                  )
        v.                        )
                                  )
MICHAEL J. ASTRUE,                )        MEMORANDUM OPINION
Commissioner of the Social        )
Security Administration,          )
                                  )
            Defendant.            )
_____  )

        This is an action brought under Title II of the Social

Security Act, 42 U.S.C. §§ 401 et seq. (the "Act") for judicial

review of the Commissioner of the Social Security Administration

(the "SSA"), wherein the Commissioner determined Gia Lucia M.

Bodnar ("Bodnar") was not "disabled," because of Bodnar's drug

addiction, and therefore, was not entitled to receive disability

benefits under 42 U.S.C. § 423.  Upon review, the Court affirms

the Commissioner's decision.

## I. BACKGROUND

        Bodnar was born on July 6, 1965, and is currently

forty-four years old.  Starting in August 1996, Bodnar's primary

care physician, Dr. Michael Mancuso, M.D., diagnosed Bodnar as

suffering from depression (Tr. 567).  Dr. Mancuso provided Bodnar

with prescriptions for anti-depressants and noted Bodnar refused

to see a psychiatrist (Tr. 455, 573, 527).

In August 2001, Bodnar was admitted to Bergan Mercy Medical Center for drug overdose treatment.  Laboratory drug tests for opiates and benzodiazepines were positive (Tr. 207). During her hospital stay, Bodnar would not cooperate with the psychiatric staff and was ultimately transferred to Immanuel Psychiatry (Tr. 207-08).

On June 29, 2004, Bodnar filed an application for disability insurance benefits (Tr. 19).  In her initial application, Bodnar claimed to have been disabled since August 3, 1969, but later amended her onset date to May 1, 2005, following her last day of work as a telemarketer (Tr. 101, 782; Plaintiff's Brief, Filing No. 12, at 4).  Bodnar claimed her disability arose, *inter alia*, from fibromyalgia, arthritis, high stress levels, respiratory problems, depression, and bipolar disorder (Tr. 125, 128).  Bodnar also disclosed she was a drug addict (Tr. 143).  Bodnar's educational background included completing high school, and her work background included jobs as a telemarketer, sales clerk, and general clerk (Tr. 20).

On November 15, 2004, Dr. Caroline Sedlacek, Ph.D., examined Bodnar in conjunction with Bodnar's initial disability insurance benefits application (Tr. 352-56).  During the examination, Bodnar disclosed to Dr. Sedlacek that she had consumed alcohol and smoked cannabis in high school and in her early twenties and had consumed speed in high school (Tr. 354).

-2-

From this examination, Dr. Sedlacek ultimately diagnosed Bodnar as having the following mental and personality disorders:  major depressive disorder; generalized anxiety disorder; and personality disorder with Cluster B features such as borderline features and also some dependant features (Tr. 356).  Dr. Sedlacek assessed Bodnar's global assessment of functioning (GAF) scale score at fifty.[1]

On November 17, 2004, Dr. Bradley Wilcox, D.O., examined Bodnar in conjunction with Bodnar's initial disability insurance benefits application (Tr. 357).  Bodnar claimed to not have been in good health since having a hysterectomy[2] (Tr. 357).  Bodnar complained of wobbliness and reported she had used a cane for five years; however, she worked from 3:00 p.m. to 9:00 p.m. (Tr. 26, 358-59).  Bodnar denied using illicit drugs at this time

---

[1] A GAF scale is a tool used in the Diagnostic and Statistical Manual of Mental Disorders for assessing a person's overall psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders -- Text Revisions 34 (4th Edition 2000).  For reference, a scale score between 21-30 indicates a person's behavior is considerably influenced by delusion or hallucination, or serious impairment in communication or judgment.  *Id.*  A scale score between 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  A scaled score between 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functions (e.g. few friends, conflicts with peers or co-workers).  *Id.*

[2] Bodnar underwent a hysterectomy in 2003 (Tr. 254, 340).

-3-

(Tr. 26, 359).  Dr. Wilcox's impressions of Bodnar were that
Bodnar suffered from fibromyalgia, major depression, arthritis,
and hot flashes (Tr. 363).  Dr. Wilcox observed that Bodnar had
limitations in range of motion in both her upper and lower
extremities and in her spine (Tr. 364).

On November 23, 2004, Bodnar underwent a psychiatric
review administered by a state agency doctor (Tr. 367-69).  The
state doctor determined Bodnar was only moderately limited in her
ability to understand and remember detailed instructions, her
ability to carry out detailed instructions, her ability to
maintain attention and concentration for extended periods, her
ability to sustain an ordinary routine without special
supervision, and her ability to complete a normal work-day and
workweek without interruptions from psychologically based
symptoms and to perform at a consistent pace without an
unreasonable number of length or rest periods (Tr. 367-68).

Also on November 23, 2004, Dr. Donald Larson, M.D.,
completed a physical residual functional capacity assessment of
Bodnar (Tr. 387-95).  Dr. Larson noted Bodnar could occasionally
lift/carry twenty pounds and could frequently lift/carry ten
pounds, could sit with normal breaks approximately six out of
eight hours a day, could push and pull limited amounts of weight,
and could occasionally climb, balance, stoop, kneel, crouch, and
crawl (Tr. 388-89).  Dr. Larson observed Bodnar had no

-4-

manipulative, visual, or communicative limitations (Tr. 390-91). The SSA denied Bodnar's application for social security disability benefits at the initial level of administrative determination on November 30, 2004 (Tr. 19).

Bodnar asked for review at the reconsideration level of administrative determination (Tr. 19). On February 22, 2005, another doctor affirmed Dr. Larson's findings regarding Bodnar's physical residual functional capacity (Tr. 396). On February 23, 2005, the SSA again denied Bodnar's application for disability benefits (Tr. 19, 71-72). Bodnar was not satisfied with these denials and filed a Request for Hearing on March 14, 2005, to have the matter heard before an administrative law judge (Tr. 19).

Sometime between April and May 2005, Bodnar claimed to begin using "increased" amounts of crack cocaine (Tr. 401, 420 427). On August 29, 2005, Bodnar was admitted to Immanuel Medical Center, where Dr. Hudson Hsieh, M.D., treated Bodnar for depression, resulting from a week-long manic phase and from using crack cocaine for the previous four months (Tr. 22, 401, 427). On September 12, 2005, Bodnar was discharged with diagnoses of bipolar affective disorder, cocaine dependence, and nicotine dependence (Tr. 22, 401). During this visit to Immanuel, Dr. Hsieh assessed Bodnar's GAF scale score to be twenty-five at admission and fifty at discharge (Tr. 401).

-5-

Following discharge from Immanuel on September 12, 2005, Bodnar transferred to Omaha Campus for Hope ("OCFH") for treatment for her cocaine addiction (Tr. 22, 431).  On October 6, 2005, Bodnar was prematurely discharged from OCFH because of behavioral issues, with a GAF scale score of fifty (Tr. 22, 431). While at OCFH, Bodnar was diagnosed with cocaine dependence, cannabis dependence, alcohol abuse, and opiate dependence (Tr. 22, 432).  The OCFH discharge summary disclosed Bodnar had medical issues directly related to her drug use (Tr. 431).

On November 8, 2005, Bodnar entered Immanuel Medical Center again for treatment of depression, irritability, and fear of impulsive behavior (Tr. 22, 588-97).  Dr. Hsieh treated Bodnar again (Tr. 588).  Dr. Hsieh diagnosed Bodnar with bipolar disorder and cocaine dependence (Tr. 588).  In her medical notes, Dr. Hsieh stated:  "We have noticed rapid resolution of symptoms with the introduction of psychotropic medication and with the participation in the group and individual psychotherapy sessions" (Tr. 20, 588).  Dr. Hsieh again assessed Bodnar's GAF scale score as twenty-five at admission and fifty at discharge (Tr. 22, 588).

On December 5, 2005, Heather Wilhelm, APRNC, conducted an outpatient initial evaluation on Bodnar at Psychiatric Associates Bellevue (Tr. 685-89).  Bodnar went to Ms. Wilhelm with the purpose of obtaining treatment for her bipolar affective disorder and her poly-substance abuse (Tr. 685).  Ms. Wilhelm

-6-

assessed Bodnar's GAF scale score to be thirty (Tr. 687).   Ms.
Wilhelm noted Bodnar's mood instability had stabilized
sufficiently to independently address daily living concerns and
Bodnar's anxiety symptoms were sufficiently under control when
Bodnar was not under the influence of mood-altering illicit drugs
and alcohol (Tr. 688).

On February 9, 2006, Bodnar once again entered OCFH to
obtain "Short-Term Residential Treatment" to help with her
cocaine addiction (Tr. 701).   The OCFH staff gave Bodnar a poor
prognosis, as the staff observed Bodnar could not correlate her
negative behaviors with her addiction and irrational thought
process (Tr. 702).   Ultimately, Bodnar left OCFH prematurely
against the OCFH staff's advice on March 19, 2006, ostensibly for
the purpose of providing support to her niece (Tr. 701).

On March 26, 2006, Bodnar's parents brought Bodnar to
Immanuel Medical Center in order for Bodnar to have a mental
health evaluation (Tr. 23, 704).   Bodnar stated she was severely
agitated and was addicted to crack cocaine, but she denied having
used crack cocaine since leaving OCFH the previous week (Tr. 23,
704).   Bodnar stated she started using cocaine in 2004 and the
last time she used crack cocaine was on January 31, 2006 (Tr. 23,
706).   A doctor at Immanuel estimated Bodnar's GAF scale score
for the previous year at sixty, and assessed her current GAF
scale score at twenty-five.   Later, Dr. Hsieh assessed Bodnar's

-7-

GAF scale score to be twenty at admission and fifty at discharge on April 27, 2006 (Tr. 23, 709).

On April 26, 2006, Dr. Hsieh wrote a "To Whom It May Concern" letter with regard to Bodnar's hospitalization since March 26 (Tr. 23, 584).  Dr. Hsieh diagnosed Bodnar as suffering from bipolar disorder and chemical dependence (Tr. 23, 584).  In the letter, Dr. Hsieh also stated Bodnar was "totally disabled for purpose of gainful employment" and was expected to continue her psychiatric and chemical dependency treatments (Tr. 23, 584).

On May 2, 2006, Ms. Wilhelm also wrote a "To Whom It May Concern" letter, in which Ms. Wilhelm stated she had started seeing Bodnar on December 5, 2005, and Bodnar was "significantly disabled" (Tr. 23, 583).  Ms. Wilhelm stated Bodnar needed extensive medication management and individual psychotherapy (Tr. 23, 583).  Ms. Wilhelm also stated in her letter Bodnar was not capable of being employed due to Bodnar's significant disability (Tr. 23, 583).

On May 13, 2006, Dr. Mancuso completed a medical questionnaire in conjunction with Bodnar's social security disability benefits application (Tr. 23-24, 669-70).  In the questionnaire, Dr. Mancuso stated Bodnar suffered from hypothyroidism, fibromyalgia, bipolar disorder, poly-substance dependency, and migraines (Tr. 669).  Dr. Mancuso stated Bodnar would require unscheduled rest periods at work, would potentially

-8-

have frequent and unpredictable absences from work, and would require having the option of alternating sitting and standing at work at will (Tr. 670).  In addition, Dr. Mancuso noted Bodnar would have difficulty with mental concentration (Tr. 670).  Dr. Mancuso also indicated Bodnar's impairments were reasonably consistent with her symptoms and functional limitations (Tr. 23-24, 670).

On May 17, 2006, Dr. Beverly Doyle, Ph.D., conducted a psychological evaluation of Bodnar, who was accompanied by an OCFH staff member (Tr. 24, 671-72).  The OCFH staff member told Dr. Doyle that Bodnar was in a program at OCFH dealing with individuals who have dual-diagnosis (mental health and chemical dependence) issues (Tr. 671).  Dr. Doyle assessed Bodnar's GAF scale score at forty-five (Tr. 24, 672).

Dr. Doyle also completed a "Mental Residual Functional Capacity Assessment" at the request of Bodnar's representative (Tr. 24, 673-75).  In this assessment, Dr. Doyle noted Bodnar had a "marked limitation" in dealing with work stress, had a "markedly limited" ability to complete a normal workday and workweek without interruptions from her psychologically based symptoms and to perform at a consistent pace without unreasonable rest periods, to accept instructions and respond appropriately to criticism from co-workers and supervisors, and to get along with co-workers or peers without distracting them or exhibiting

-9-

behavioral extremes (Tr. 24, 673-74).  Dr. Doyle noted Bodnar had a "moderately limited" ability to perform scheduled activities, to attend work regularly, and to be punctual (Tr. 24, 674).  Dr. Doyle indicated Bodnar would likely be disabled even if Bodnar discontinued her drug abuse (Tr. 24, 675).

On June 5, 2006, Dr. Hsieh completed a "Mental Residual Functional Capacity Assessment" at the request of Bodnar's representative (Tr. 25, 690-93).  In the assessment, Dr. Hsieh noted a "marked limitation" in Bodnar's ability to deal with work stress (Tr. 25, 690).  Dr. Hsieh also noted Bodnar had a "marked limitation" in Bodnar's ability to complete a normal workday and workweek without interruptions from her psychologically based symptoms and to perform at a consistent pace without unreasonable rest periods, to accept instructions and respond appropriately to criticism from co-workers and supervisors, to perform scheduled activities, to attend work regularly, to be punctual, and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes (Tr. 25, 690-91).  Dr. Hsieh concluded Bodnar would be disabled even if Bodnar discontinued her drug abuse (Tr. 25, 692).  Ms. Wilhelm, on July 17, 2006, completed a medical questionnaire form in which she agreed with Dr. Hsieh's assessment of Bodnar (Tr. 703).

On June 8, 2006, an administrative law judge[3] (the "ALJ") conducted an initial hearing of Bodnar's case in connection with Bodnar's request for rehearing from March 14, 2005.  At the June 8 hearing, the ALJ heard testimony from Bodnar regarding her general background, her history of mental disease, her employment history, and her history of using drugs (Tr. 733-40).  The ALJ ultimately stopped the hearing and rescheduled it for July 10, 2006, when the ALJ learned of Bodnar's drug use (Tr. 739).  The ALJ stopped the hearing in order to have a medical expert testify at the hearing regarding the effects Bodnar's poly-substance abuse had on her disability (Tr. 739).

On June 28, 2006, Dr. Doyle completed an addendum to her May 17, 2006, mental residual functional capacity report (Tr. 25, 697).  Dr. Doyle stated Bodnar's physical problems appeared to increase during stressful periods, stated Bodnar had "many negative work attitudes" that could limit Bodnar's adaptability at work, and stated Bodnar had low morale, lacked interest in work, and had personality problems that would impact her success in a work environment (Tr. 25, 697).

On July 10, 2006, the ALJ reconvened the hearing, at which time the ALJ heard testimony from Bodnar, Dr. Thomas England, M.D., a medical expert, and Deborah Determan, a vocational expert (Tr. 744-809).  Bodnar testified, again,

---

[3] The Honorable Jan E. Dutton, Administrative Law Judge.

-11-

regarding her general background, her past mental illnesses, her
employment history, and her drug use (Tr. 752-57).  Regarding her
employment history, Bodnar testified she had worked as a general
clerk, a sales clerk, and a telemarketer (Tr. 735-36).  Bodnar
also testified she had started using crack cocaine in April 2004,
concurrent with her last steady employment as a telemarketer,
from which she was fired for absences (Tr. 756).  Bodnar claimed
her work absences were due to mood swings, but also admitted her
drug use had "a lot to do with it" (Tr. 756, 780).  Bodnar also
testified she was not using drugs prior to or during her November
2005 hospitalization at Immanuel Medical Center, nor when she met
Ms. Wilhelm immediately thereafter (Tr. 768).

Next, Dr. England testified regarding Bodnar's medical
condition (Tr. 781).  Dr. England testified that after the date
of disability Bodnar's condition met the listing requirements --
under 20 C.F.R. § 404, Subpt. P, App. 1, pt. A, 12.00 et seq. --
for determining if a mental illness constitutes a disability (Tr.
783).  Specifically, Dr. England stated Bodnar's condition fit
within Category 12.04 (Affective Disorders), Category 12.06
(Anxiety-related Disorders), and Category 12.09 (Substance
Addiction Disorders) (Tr. 783).  However, Dr. England stated if
Bodnar's poly-substance abuse was not taken into account, Bodnar
would not meet any of the listings (Tr. 783).  Thus, Dr. England
stated Bodnar's poly-substance abuse was material, meaning when

-12-

Bodnar was using drugs, she was disabled, but when Bodnar was not
using drugs, she was not disabled under the listings (Tr. 784).

Dr. England next testified regarding how drug use
affected Bodnar's functioning (Tr. 785-86).  Dr. England stated
that without drug use, Bodnar's mental disorders affected her
daily living activities mildly or moderately, her social
interactions mildly to moderately, and her concentration,
persistence, and pace moderately but potentially markedly (Tr.
785-86).  Conversely, when combined with drug use, Dr. England
stated Bodnar's mental disorders affected her daily living
activity markedly, her social interaction mildly to markedly, and
her concentration, persistence, and pace markedly (Tr. 786).

Next, Ms. Determan, the vocational expert, testified
before the ALJ regarding the likelihood Bodnar could find
employment given her physical and mental condition if Bodnar was
not taking drugs (Tr. 801).  The ALJ described Bodnar's condition
to Ms. Determan in the form of a hypothetical:

> She could occasionally lift or
> carry 20 pounds, frequently lift or
> carry 10 pounds.  Stand or walk or
> sit six hours in an eight-hour day.
> Could occasionally do postural
> activity.  Should avoid
> concentrated exposure to cold, to
> heat, to vibration, and hazards.
> And then from a mental standpoint,
> is capable of performing simple,
> routine, repetitive work where
> she's not called upon to deal with
> job changes, set goals, or maintain
> extended attention or interaction.

-13-

(Tr. 802-03).

With the hypothetical in place, the ALJ posed a series of questions to Ms. Determan regarding Bodnar's employment potential.  The ALJ first asked Ms. Determan whether Bodnar would be precluded from her past relevant work, and Ms. Determan responded that Bodnar would (Tr. 803).

Next, the ALJ asked Ms. Determan, hypothetically, whether there was work someone with Bodnar's impairments could perform (Tr. 803).  Ms. Determan responded an individual with the description given in the hypothetical could perform several unskilled tasks (Tr. 803).  After disclosing three specific types of work someone with Bodnar's impairments could perform, Ms. Determan expressed a hypothetical individual with Ms. Bodnar's impairments could do at least 80% of the sedentary positions and 50% of unskilled light exertional positions (Tr. 804).

Next, the ALJ asked Ms. Determan whether, based on Dr. England's testimony, Bodnar could perform the identified jobs were she not abusing crack cocaine (Tr. 804).  Ms. Determan responded: "Wow, that's a hard question," and asked the ALJ to be more specific (Tr. 805).  The ALJ restated the question, "Was there anything in [Dr. England's] testimony, assuming [Bodnar] weren't using the drug, that would preclude her ability to do the types of jobs you have identified?" (Tr. 805).  Ms. Determan responded, based on Dr. England's analysis that Bodnar was only

-14-

mildly to moderately impaired by her mental disorders when not under the influence of drugs, Bodnar could work full time at the identified jobs if Bodnar could "maintain a level of persistence and pace and concentration that would allow her to stay on task, consistently attend to work, and maintain attendance" (Tr. 805). However, Ms. Determan stated that if Bodnar could not regularly attend work or work tasks, then Bodnar would be precluded from competitive employment (Tr. 805).

On July 12, 2006, after the second hearing before the ALJ, Nickie Ludemann, BSW, an OCFH staff member, wrote Bodnar's representative to inform the representative that Bodnar had returned to OCFH for a third time (Tr. 26, 698). The letter stated Bodnar had entered the long-term dual-diagnosis treatment program for this current stay at OCFH, which differed from Bodnar's previous visits to OCFH for short-term treatment (Tr. 698). Ms. Ludemann also stated she did not feel Bodnar would successfully handle social interactions and the stressors of full-time employment (Tr. 26, 700).

On January 19, 2007, the ALJ issued a decision denying Bodnar's claim for disability benefits (Tr.19-35). In her decision, the ALJ analyzed the claim by going through the five-step analysis, prescribed by 20 C.F.R. § 404.1520, to evaluate a physical or mental disability. Under Step One, the ALJ found Bodnar had not performed substantial employment since May 1, 2005

-15-

(Tr. 20, 34).  Under Step Two, the ALJ found the combination in Bodnar of fibromyalia/diffuse myalgia, general anxiety disorder, personality disorder, and poly-substance abuse caused Bodnar more than a slight limitation in her ability to function (Tr. 34). Also, the ALJ found Bodnar's poly-substance abuse was a contributing factor to Bodnar's impairments, but could not be considered pursuant to 42 U.S.C. § 423(d) and 20 C.F.R. § 404.1535 (Tr. 34).  Under Step Three, the ALJ considered the medical severity of Bodnar's impairments and determined her impairments did not meet or exceed one of the listings in 20 C.F.R. § 404, Subpt. P, App. 1 (Tr. 34).  Under Step Four, the ALJ assessed Bodnar's residual functional capacity:

> [Bodnar] has the ability to occasionally lift and carry up to 20 pounds and 10 pounds frequently. She would be able to stand and walk for up to six hours in a normal eight hour workday with normal breaks.  She could occasionally climb, balance, stoop, kneel, crouch and crawl.  She could have occasional exposure to cold, heat, vibrations and hazards.  When not abusing drugs, she could perform simple, routine, repetitive work that did not require her to set goals or deal with job changes or have extended concentration; social interaction would be limited to brief and superficial.

(Tr. 34-35).  The ALJ further determined, based on Bodnar's residual functional capacity, Bodnar could not perform her past jobs as a telemarketer, a sales clerk, or a general clerk (Tr.

-16-

35).  Under Step Five, given Bodnar's residual functional
capacity, there were a significant number of positions in the
national and regional economy existing for Bodnar to perform (Tr.
35).  Because the ALJ determined other work existed in
significant numbers for Bodnar to perform, the ALJ found Bodnar
was not disabled for the purposes of receiving Social Security
disability benefits (Tr. 35).

On January 29, 2007, Bodnar filed a Request for Review
of Hearing Decision/Order with the SSA (Tr. 13) On February 6,
2008, the Office of Disability Adjudication and Review denied
Bodnar's request for review, making the ALJ's decision a final
decision (Tr. 7).  Bodnar subsequently filed a complaint with
this Court, seeking review of the ALJ's decision (Filing No. 1).

## II. STANDARD OF REVIEW

The Court reviews the record "to determine whether the
Commissioner's findings are supported by substantial evidence on
the record as a whole."  *Prosch v. Apfel*, 201 F.3d 1010, 1012
(8th Cir. 2000) (quoting *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th
Cir. 2000)).  "Substantial evidence is less than a preponderance,
but is enough that a reasonable mind would find it adequate to
support the Commissioner's conclusion."  *Prosch*, 201 F.3d at
1012.  "[The Court] may not reverse the Commissioner's decision
merely because substantial evidence supports a contrary outcome."
*Id.* (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir.

-17-

1999)). "[A] reviewing court should not consider a claim *de
novo*, nor abdicate its function to carefully analyze the entire
record." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

### III. DISCUSSION

Bodnar argues in a circuitous manner there is not
substantial evidence on the record supporting the ALJ's
conclusion that Bodnar was not disabled within the meaning of the
Social Security Act. Specifically, Bodnar asserts the following
arguments: (1) the ALJ gave too much weight to the medical
opinion of Dr. England, the medical examiner, who testified at
the administrative hearing regarding Bodnar's disability and
mental residual functional capacity; (2) the ALJ erred in
considering Bodnar's lack of compliance with medical treatment
and Bodnar's drug addiction; and (3) the ALJ erred in posing a
hypothetical to the vocational expert, Ms. Determan.

**A. Weight Given to Dr. England's Testimony**

Bodnar claims the ALJ gave undue weight to the
testimony of Dr. England regarding Bodnar's residual functional
capacity, instead of relying on the medical opinions of Dr.
Hsieh, Dr. Doyle, and Dr. Mancuso.[4] Although an ALJ can give a
treating physician's opinion controlling weight, the ALJ is not
required to give controlling weight to a treating physician's

---

[4] Bodnar makes this assertion as her brief's first and third
arguments (Pl. Brief, Filing No. 12,10-15, 21-22). For the
purpose of this Analysis, the Court combines these arguments.

-18-

opinion. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006)
(citing 20 C.F.R. § 404.1527(d)(2)).  If an ALJ finds a treating
physician's opinion to be inconsistent with other substantial
evidence in the case's record, the ALJ need not give the treating
physician's opinion controlling weight. *See Hacker*, 459 F.3d at
937 (citing 20 C.F.R. § 404.1527(d)(2)).  If the medical evidence
in the record as a whole contradicts the treating physician's
opinion, the treating physician's opinion is given less
deference. *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999).

        The medical evidence in the record as a whole
contradicts the opinions of Bodnar's treating physicians that
Bodnar was disabled, even when Bodnar was not under the influence
of drugs.  First, Dr. Hsieh, Bodnar's treating physician at
Immanuel Medical Center, saw Bodnar on three occasions (August
29, 2005, November 8, 2005, and March 26, 2006) primarily to
treat Bodnar's bipolar disorder and cocaine dependence.  Bodnar's
admissions to Immanuel on August 29th was explicitly for the
purpose of treating Bodnar's crack cocaine dependence.  Although
Bodnar's admission into Immanuel on November 8, 2005, and March
26, 2006, were not initially for the express purpose of treating
Bodnar's crack cocaine dependence, there is substantial evidence
in the record indicating Bodnar received extensive treatment for
her crack cocaine dependence.  During the November 8th
hospitalization, Dr. Hsieh's medical notes diagnose Bodnar as

-19-

bipolar disorder and cocaine dependent (Tr. 588).  In addition, Bodnar's March 26 hospitalization followed soon after Bodnar prematurely left OCFH, and Dr. Hsieh's records indicated a diagnosis of cocaine dependence during this hospitalization. Because Dr. Hsieh only saw Bodnar while Bodnar was addicted to crack cocaine, Dr. Hsieh's opinion that Bodnar would be disabled even if Bodnar was not taking drugs is contradicted by the medical record as a whole.  Thus, the ALJ was not required to give deference to Dr. Hsieh's opinions regarding Bodnar's condition.

        For the same reasons, Dr. Mancuso's and Dr. Doyle's opinions that Bodnar was disabled even when not under the influence of drugs are also given less weight.  Although Dr. Mancuso and Dr. Doyle evaluated Bodnar approximately one month prior to the June 8, 2006, hearing with the ALJ and stated Bodnar was disabled even when not under the influence of drugs, there is no basis in the medical record supporting their conclusions regarding Bodnar's condition.  Dr. Mancuso's and Dr. Doyle's opinions are undercut because they both evaluated Bodnar during a period when she was still addicted to crack cocaine.  Because Dr. Mancuso's and Dr. Doyle's opinions contradict the medical record as a whole, the ALJ was not required to give Dr. Mancuso's and Dr. Doyle's opinions deference.

While medical evidence in the record as a whole did not support the medical assessments of Bodnar's treating physicians, Dr. England's assessment of Bodnar's residual functional capacity was supported by substantial evidence in the record as a whole. First, the record indicates Bodnar was capable of working until May 1, 2005, approximately coinciding with Bodnar's increased crack cocaine use in April 2005.

Second, Bodnar had no major mental impairments prior to her increased crack cocaine use in April 2005. Bodnar's psychiatric evaluation administered on November 23, 2004, prior to Bodnar's increased crack cocaine use starting in April 2005, indicated Bodnar was only moderately limited in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to sustain an ordinary routine without special supervision, and her ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length or rest periods (Tr. 367-68). Prior to the November 23rd evaluation, Bodnar's only hospitalization as an adult was in August 2001 in connection with a drug overdose.

Third, and by contrast, after Bodnar increased her crack cocaine use in April 2005, Bodnar had several mental

-21-

impairment issues.  Specifically, the medical record indicates
Bodnar was hospitalized at Immanuel Medical Center three times
either expressly or impliedly for her crack cocaine dependence.

Fourth, during the November 2005 hospitalization, Ms.
Wilhelm noted Bodnar could keep her anxiety symptoms under
control when Bodnar was not under the influence of drugs (Tr.
688).  In light of all of these facts, there is substantial
evidence in the medical record as a whole supporting Dr.
England's assessment Bodnar was not disabled when she was not
under the influence of drugs.  Thus, the ALJ did not err in
giving deference to Dr. England's testimony regarding Bodnar's
residual functional capacity in making the decision that Bodnar
was not disabled.

**B. Compliance with Treatment and Drug Addiction**

Bodnar also argues the ALJ improperly handled (1)
Bodnar's lack of compliance with her medical treatments, and (2)
Bodnar's drug addiction in finding Bodnar was not disabled.
Regarding the ALJ's treatment of Bodnar's lack of compliance with
her medical treatment, Bodnar wrongly asserts Social Security
Ruling 82-59, entitled "Failure to Follow Prescribed Treatment,"
is applicable to this case.  S.S.R. 82-59 applies in cases where
it is necessary to determine whether a disability claimant, who
has not followed a prescribed treatment, would be disabled even

-22-

if the claimant followed the prescribed treatment.  S.S.R. 82-59,
1975-1982 Soc. Sec. Rep. Serv. 793, 793 (1982).

        Although the ALJ mentions compliance briefly in her
decision (Tr. 30), the ALJ considered Bodnar's compliance only in
connection with Bodnar's credibility at the hearing.  Bodnar's
lack of compliance with her prescribed medical treatment was not
a contributing factor in the ALJ's decision regarding Bodnar lack
of disability.  Rather, Bodnar's drug addiction was the
contributing factor in the ALJ's decision that Bodnar was not
disabled.  Thus, the Court need not address whether Bodnar's
compliance (or lack thereof) with medical treatment contributed
to the ALJ's determination that Bodnar's was not disabled.

        Regarding the ALJ's handling of Bodnar's drug
addiction, Bodnar asserts the ALJ did not follow the proper
procedure for analyzing whether a claimant's drug addiction is a
contributing factor to the claimant's disability.  The procedure
for determining whether a claimant's drug addiction is a
contributing factor is stated in 20 C.F.R. § 404.1535.  Under
this regulation the Commissioner must determine if the claimant
would be disabled if the claimant stopped using drugs.
§ 404.1535(b)(1) .  In making this determination, the
Commissioner must evaluate which physical and mental limitations
would remain if the claimant stopped using drugs and whether
those remaining limitations would render the claimant disabled.

-23-

§ 404.1535(b)(2).  If the remaining limitations would render the claimant not disabled, the Commissioner must determine whether the claimant's drug use is a contributing factor to the claimant's disability.  § 404.1535(b)(2)(I).  If a claimant's drug addiction is a contributing factor to the claimant's disability, the claimant is not considered disabled for the purposes of social security disability insurance benefits. 42 U.S.C. § 423(d)(2)(C).

        The ALJ in this case followed the procedure directed in 20 C.F.R. § 404.1535 to determine whether Bodnar's drug addiction was a contributing factor to her disability.  The ALJ first determined from Dr. England's testimony at the hearing that Bodnar was disabled when Bodnar was under the influence of drugs.[5]  Then, based on Dr. England's testimony that Bodnar would not meet any of the listings for mental disability under 20 C.F.R. § 404, Subpt. P, App. 1, pt. A, 12.00 et seq., the ALJ determined Bodnar was not disabled when she was not taking drugs. The ALJ's analysis fulfills the requirements of 20 C.F.R. § 404.1535, and Dr. England's testimony constitutes substantial evidence supporting the ALJ's decision.  Thus, the ALJ properly handled the issue of Bodnar's drug addiction, and the information pertaining to Bodnar's drug addiction found in the record

---

        [5] As stated *supra*, Dr. England's testimony constitutes substantial evidence.

constitutes substantial evidence from which the ALJ could base her decision.

## C. The ALJ's Hypothetical to the Vocational Expert

Bodnar argues the ALJ erred in posing a hypothetical to the vocational expert, Ms. Determan.  Bodnar claims the hypothetical did not properly incorporate the restrictions set forth by Bodnar's testimony or the opinions of treating and consulting physicians, psychologists, and psychiatrists.  Bodnar further claims because the hypothetical was not proper any information derived from Ms. Determan's testimony that relied on the hypothetical cannot constitute substantial evidence supporting the ALJ's decision.

"A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence." *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (quoting *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996)).  In order for a hypothetical question to be sufficient, the question must "set forth the impairments which are accepted as true by the ALJ." *Haggard*, 175 F.3d at 595.  In formulating the hypothetical, the ALJ must include impairments the ALJ found supported by substantial evidence in the record as a whole, but need not include impairments the ALJ does not find supported by substantial evidence in the record as a whole.  *See Prosch v.*

*Apfel*, 201 F.3d 1010, 1012, 1015 (8th Cir. 2000) (citing *Haggard*, 175 F.3d at 595).

The Court finds the hypothetical was proper because there was substantial evidence in the record as a whole supporting the ALJ's formulation of the hypothetical.  Regarding the physical limitations in the hypothetical, the ALJ incorporated language from Dr. Larson's and Dr. Wilcox's medical report pertaining to Bodnar's physical residual functional capacity.  Dr. Larson's and Dr. Wilcox's medical reports are substantial evidence of Bodnar's physical capacity.

Regarding the mental limitations in the hypothetical, the ALJ relied on Dr. England's testimony that Bodnar's mental condition did not render her disabled when Bodnar was not taking crack cocaine.  As stated *supra*, Dr. England's testimony is substantial evidence of Bodnar's mental condition supported by other substantial evidence in the record as a whole.

Under 42 U.S.C. § 423(d) and 20 C.F.R. § 404.1535, a determination of disability cannot account for a claimant's drug or alcohol dependency.  Therefore it was proper for the ALJ not to include any information in the hypothetical relating to Bodnar's crack cocaine dependency.

The ALJ did not err with regard to the hypothetical posed to Ms. Determan because the hypothetical the ALJ posed to Ms. Determan was based on substantial evidence in the record as a

-26-

whole.  Therefore, Ms. Determan's testimony regarding Bodnar's potential to find employment if Bodnar was not taking drugs constituted substantial evidence supporting the ALJ's finding that Bodnar was not disabled.

### IV. CONCLUSION

The Court finds substantial evidence in the record as a whole on which the ALJ based her decision to deny disability benefits to Bodnar.  Specifically, the testimony of Dr. England and Ms. Determan at the administrative hearing and Bodnar's documented history of addiction to crack cocaine support a finding that Bodnar was not disabled for the purposes of the Social Security Act.  Accordingly, the Court will affirm the ALJ's decision.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 19th day of August, 2009.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court

-27-